[Cite as *In re J.D.*, 2025-Ohio-746.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE J.D. | : | |
| A Minor Child | : | No. 114007 |
| [Appeal by J.D.] | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** March 6, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-22-104622

---

### *Appearances:*

Elizabeth Miller, Ohio Public Defender, and Lauren Hammersmith, Assistant State Public Defender, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nicholas Fink, Assistant Prosecuting Attorney, *for appellee*.

EILEEN A. GALLAGHER, A.J.:

{¶ 1} J.D. appeals the order of the Cuyahoga County Court of Common Pleas, Juvenile Division, adjudicating him delinquent and committing him to the Ohio Department of Youth Services ("ODYS"). For the reasons that follow, we reverse the juvenile court's judgment and remand for further proceedings.

## I.    Facts and Procedural History

{¶ 2} On May 6, 2022, a complaint was filed against J.D., who was 14 years old and in the temporary custody of the Cuyahoga County Division of Children and Family Services ("CCDCFS"), alleging that he committed what would have been several robbery and firearm offenses if committed by an adult.  The juvenile court held a hearing the same day, at which the prosecutor stated that J.D. and a 12-year-old juvenile were alleged to have stolen a car while pointing a gun at the victim.  The victim and a friend allegedly got into another vehicle and chased the juveniles "through the City."  This chase resulted in a motor vehicle crash and J.D. and the other juvenile were apprehended.

{¶ 3} On September 13, 2022, J.D. was adjudicated delinquent after admitting to one count of aggravated robbery with a three-year firearm and a forfeiture specification.  The juvenile court referred the matter to the "ODYS Committee for recommendation regarding disposition" and ordered that J.D. "remain[] in secure detention . . . ."

{¶ 4} The "ODYS Committee Referral" form ("Referral Form") concerning J.D., dated October 6, 2022, details J.D.'s "Probation History" and states, in part, as follows:

> [J.D.] was first involved with this court on October 19, 2018, on case number DL-18-112105, this case was dismissed on October 24, 2018, due to [J.D.] not being found competent.  In case number DL-18-112477, Domestic Violence, this case was also dismissed on October 24, 2018, due to [J.D.] not being competent.  In case number DL-19-

100997, Domestic Violence, this case was dismissed on February 27, 2019 [because J.D.] was not found competent.[1]

{¶ 5} The Referral Form further notes that J.D. was found delinquent in two cases, subsequent to his incompetency findings, after he "struggled with," but ultimately completed, the juvenile court's Competency Remediation Program in November 2020. Additionally, J.D. was found to be in violation of his probation several times in 2021, was placed on home detention with an electronic monitor and was "accepted into placement" at a facility but "never went to placement."

{¶ 6} The Referral Form listed J.D.'s "special concerns" as: "Mental Health Concerns (ADHD, Other Specified Trauma and Stressor Related Disorder, Cannabis Use Disorder, Moderate, and Intellectual Disorder, Moderate); On Medication." The Referral Form stated that the following "Intervention" had been "tried" but were "terminated": Probation; PEP IHBT; Applewood and Cuyahoga County Board of Developmental Disabilities. Finally, the Referral Form listed the "Objectives of Referral" as follows: "Manage mental health symptoms; Decrease aggressive behavior; Address high risk behaviors; Improve academic functioning and attendance; Improve social skills; Improve family interactions; Address positive associations/interactions with peers; Chemical Dependency Issues; Medication compliance."

---

[1] J.D. was born in August 2007 and was first found incompetent in juvenile court on October 24, 2018, when he was 11 years old.

{¶ 7} As a result of the Referral Form, the juvenile court ordered J.D. to undergo a competency-to-stand-trial evaluation, which was conducted on October 26, 2022, by the juvenile court's Diagnostic Clinic's Dr. Frank Ezzo. Dr. Ezzo issued a report on October 31, 2022 ("First Competency Report"). In the First Competency Report, Dr. Ezzo stated that "[o]f immediate concern to the court pursuant to ORC 2152.51(A)(1) is [J.D.'s] ability to understand the nature and objectives of the proceeding against him and to assist in his own defense." The First Competency Report listed J.D.'s mental health diagnoses as attention-deficit/hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD") and disruptive mood dysregulation disorder ("DMDD"). Dr. Ezzo noted that these diagnoses "manifested by a persistent pattern of inattention and/or hyperactivity/impulsivity that interferes with functioning . . . and a persistent irritable or angry mood most of the day, nearly every day."

{¶ 8} The First Competency Report listed J.D.'s IQ as being in the 57-59 range, noted that he "began special educational services" shortly after his fifth birthday "under the category of Emotional Disturbance" and reported that, although J.D. was in the 9th grade, he was reading at "an early first grade level."

{¶ 9} The First Competency Report concluded with the following forensic opinion:

> [J.D.] initially did not have an understanding and appreciation of the nature and objectives of court proceedings. However, after an explanation was provided, [J.D] retained the knowledge and demonstrated an understanding and appreciation of . . . court proceedings . . . and how to assist in his defense. Therefore, [J.D.]

needs reasonable accommodations during court proceedings that would involve:

1. Succinct and age appropriate communication with regards to any concepts or procedures that are not initially understood.

2. If the court proceeding is more than one-hour, [J.D.] will need a break at which time his defense attorney should provide [J.D.] with a summary of what had transpired to that point.

A referral to the Diagnostic Clinic's Competency Remediation Program is recommended if reasonable accommodations do not result in an understanding and appreciation of the core statutory requirements to competency to stand trial.

{¶ 10} On December 7, 2022, the court issued a journal entry finding that, "as a result of [the First Competency Report], the probation department is recommending that [J.D.] be released from the detention center and referred to the remediation program through the Juvenile Court Diagnostic Clinic." At this time, the court did not hold a hearing nor did it determine J.D.'s competency, which is required under R.C. 2152.58(A). R.C. 2152.58(A) states that "[n]ot less than [15] nor more than [30] business days after receiving an evaluation . . ., the court shall hold a hearing to determine the child's competency to participate in the proceeding."

{¶ 11} On March 3, 2023, approximately five months after the court received the First Competency Report, the court held a competency hearing.[2] Dr. Ezzo testified at this hearing that he interviewed J.D. for two hours. Dr. Ezzo explained

---

[2] J.D.'s competency hearing was held in relation to this case as well as Case No. DL-22-110282, which is not part of this appeal. It is unclear from the record what Case No. DL-22-110282 concerns, although at the hearing, the prosecutor stated that J.D. "picked up another case, the vandalism case, which happened in the DH where he was acting out in the DH."

that he did "not opine on the ultimate issue of competency" in his report. Rather, he gave his "opinion on what is often referred to as the prongs of competency. And the decision of whether or not a youth is competent or not competent is a judicial decision." Dr. Ezzo further explained that there are four dispositions "available": "That a youth is not competent and never will be competent, no matter what you do"; "That the youth is competent"; "That the youth is not competent, but may be competent with reasonable accommodation" and "[T]hat the youth is not competent, but may be competent with a Competent Remediation Program."

{¶ 12} Dr. Ezzo testified about his recommendation concerning J.D. in the First Competency Report:

> I clearly state that [J.D.] initially did not have an understanding and appreciation of the nature and objectives of court proceedings.
>
> What I found during my competency interview with [J.D.] was after concepts were explained to him, he retained them in that period of time and had an understanding and appreciation of those matters.
>
> The statute doesn't state, though, that the child is competent, but needs reasonable accommodations. That's not the way the Statute is worded.
>
> It's worded that the child is not competent and . . . may be competent with reasonable accommodations.
>
> And that is essentially what my recommendation is reasonable accommodation.
>
> I make a two-tier recommendation. The least restrictive recommendation is reasonable accommodations.
>
> If those don't work in vivo or here in the courtroom, then a referral to the Competency Remediation Program.

{¶ 13} At this competency hearing, the prosecutor argued that J.D. "was found competent in previous cases, and he's older now and he's still competent." J.D.'s attorney argued that "competency is fluid. And I would stipulate to Dr. Ezzo's report, and ask that reasonable accommodations be afforded in the form of participation in . . . the Remediation Program." J.D.'s guardian ad litem argued that "the Remediation Program would be in [J.D.'s] best interest. That would best ensure that he is able to truly understand and assist his attorney in his defense."

{¶ 14} The court found at the hearing that "at this time there is not competency, but that [J.D.] has the opportunity to become competent by participating in the court Remediation Services." The court also noted that J.D. had participated in this Remediation Program previously. The court ordered J.D. into the Remediation Program and released him from home detention with an electronic monitor after hearing that J.D. wanted to get a summer job.

{¶ 15} On March 8, 2023, the court issued a journal entry memorializing the March 3, 2023 hearing and finding that J.D. "is not competent but could likely attain competency by participating in services specifically designed to help [him] develop competency."

{¶ 16} The court held a hearing on April 18, 2023, concerning "an updated report as far as the Competency Remediation, that [J.D.] is halfway through the programming for that." According to the court, J.D.'s "compliance has been a little up and down with that." The prosecutor, J.D.'s probation officer and J.D.'s guardian ad litem stated on the record that J.D. was having "issues" including threatening his

school.  The court remanded J.D. to the Detention Center and ordered that he continue to participate in the Competency Remediation Program.

{¶ 17} On May 2, 2023, the juvenile court's Diagnostic Clinic issued a Competency Remediation Termination Summary ("Remediation Summary Report") regarding J.D.  The Remediation Summary Report stated that J.D. started the remediation program on March 15, 2023, and completed the program on May 1, 2023.  The Remediation Summary Report explained that the program consists of "Lessons" that are taught concerning the following subjects:  Attorney Roles; Court Process and People; Punishment and Charges; Pleas and Plea Agreements; Telling Your Story to Your Attorney; Testifying and Courtroom Behavior.  The youth participants are then quizzed on the information presented.  The Remediation Summary Report further explained that the program is "not the same as a competency to stand trial evaluation."  Rather, it allowed J.D. to "become familiar . . . with information pertaining to the court process and working with his attorney."

{¶ 18} The Remediation Summary Report concluded that J.D.'s "focus and motivation varied throughout the program," with J.D. improving over time and particularly, when he was remanded to the Detention Center, the "change in service venue allowed for more frequent meetings and [his] overall work performance was more thorough and consistent in this setting."  The Remediation Summary Report further recommended the following "Adaptations to Enhance Understanding" for J.D.:

1. For any future court hearings, it would be important to confirm that [J.D.] has taken his prescribed medications prior to participating.

2. [J.D.] may benefit from the use of visual and verbal cues from his attorney and appropriate courtroom personnel as reminders about proper court behavior.

3. [J.D.] would likely need to be provided with opportunities for breaks during lengthy court proceedings.

{¶ 19} On May 5, 2023, the court issued a journal entry stating, in part, "The Court and both parties are in receipt of the Competency Remediation Termination Summary dated May 2, 2023, and completed by the diagnostic clinic. [J.D.'s] counsel and Guardian ad litem requested that an additional independent evaluation be conducted." The court ordered J.D. to undergo a second competency evaluation and stated that this evaluation shall be completed "not more than [45] calendar days after the date of this order."

{¶ 20} More than 45 days passed and the court issued a journal entry on July 10, 2023, stating that "the independent evaluation has yet to be completed on the child." This journal entry also "relieved [J.D.'s counsel] of any and all further duties and responsibilities . . . in this case" and appointed J.D. new counsel.

{¶ 21} On August 2, 2023, Dr. Bob Stinson submitted his competency evaluation report of J.D. (the "Second Competency Report"), which concluded that J.D. was incompetent to stand trial.[3] Specifically, Dr. Stinson concluded that J.D. is

---

[3] This report indicated that "the evaluation identified case number DL-22-110282 as the case for which [J.D.] was to be assessed. However, records provided indicate he has two other cases, as well: case number DL-22-104622 and case number DL-23-105009. This appeal concerns case No. DL-22-104622. The report explained that DL-22-110282 concerned allegations that on July 2, 2022, J.D. "knowingly caused property

capable of factually and rationally understanding the nature and objective of the proceedings against him. However, . . . due to problems caused by mental illness and developmental disabilities (i.e., ADHD, DMDD, ODD, mild intellectual disability / borderline intellectual functioning), he is currently incapable of assisting in his defense." The Second Competency Report recommended that "a residential setting is the least restrictive setting in which to provide [J.D.] with competency attainment services at this time due to his significant emotional and behavioral problems . . . ."

{¶ 22} The Second Competency Report noted that on June 28, 2023, Dr. Bob Stinson interviewed J.D. for approximately one hour at the Detention Center. Dr. Stinson's associate interviewed two of J.D.'s case workers from CCDCFS and J.D.'s guardian ad litem. Attempts were made to interview J.D.'s first attorney, his second attorney and his mother. These attempts were unsuccessful. The Second Competency Report also noted that J.D. terminated the competency evaluation early because he no longer wanted to participate.

{¶ 23} The court did not hold a subsequent hearing to determine J.D.'s competency as required by R.C. 2152.58(A).

---

damage [at the] Detention Center [by] throwing objects, overturning tables, and throwing shoes which broke ceiling tiles after he 'popped' the locks on the door." The report also explained that DL-23-105009 concerned allegations that on April 11, 2023, J.D. "showed videos of himself in a stolen vehicle with a pistol in his lap which had an extended magazine and was making threats that he would 'shoot up the school.'"

{¶ 24} On November 1, 2023, the court, sua sponte,[4] issued a journal entry ordering a third competency evaluation of J.D. The court further ordered that the competency assessment report be filed no later than 45 days after the date of the court order. Dr. Lynn Williams authored this report (the "Third Competency Report") on December 27, 2023 and found that J.D. was competent to stand trial. In the Third Competency Report, Dr. Williams noted that "[t]here have been significant behavioral problems in the [Detention Center] and at school" concerning J.D. The Third Competency Report further noted that in September 2023, J.D. was charged in another delinquency case, this time with an allegation of assault.

{¶ 25} The Third Competency Report stated that J.D. "approached the . . . evaluation in an oppositional manner, initially asking to refuse the interview." Furthermore, J.D. "proceeded to answer 'I don't know' to most questions asked." Dr. Williams stated that "[b]ecause J.D. had inconsistent engagement in the evaluation process, [she] will rely on what was able to be ascertained during the interview as well as collateral sources of information . . . ." Dr. Williams stated in the report that she "ended the interview when it became clear that the youth was not adequately engaging in the assessment process."

{¶ 26} In the Third Competency Report, Dr. Williams concluded that, despite J.D.'s "limited cognitive capacity," oppositional tendencies and mental

---

[4] At the January 24, 2024 competency hearing, the court stated that "on August 31st . . . there was a request to have a second Post-Remediation Evaluation done by the Diagnostic Clinic, as well, and that was by the State of Ohio." The prosecutor agreed with the court's statement. However, nothing in the record documents the State's request, and it appears that the court issued its November 21, 2023 journal entry sua sponte.

health diagnosis, "he has the capacity to engage meaningfully if he chooses to do so." The report ultimately concluded that J.D. "has an ability to understand and appreciate the nature and objective of the proceedings against him and is able to assist in his own defense."

{¶ 27} On January 24, 2024, the court held a second competency hearing and found J.D. competent. At this hearing, it was established that, because no competency finding had been made or journalized by the court in its December 7, 2022 referral to the Remediation Program, the Diagnostic Clinic "never actually saw" J.D. until May 2023, and "[t]hey were unable . . . to do remediation . . ." in a timely manner. According to J.D.'s attorney, J.D. "is a young man that has, unfortunately, fallen through the cracks."

{¶ 28} On February 27, 2024, the court issued a journal entry memorializing the January 24, 2024 hearing. This journal entry stated in part as follows:

> The recommendation by [Dr. Stinson] was for residential treatment to stabilize [J.D.'s] behavior and mental health but that he does not require that restrictive of a setting for the purposes of competency attainment services and those could be completed in the community following residential treatment.
>
> Pursuant to R.C. 2152.59, this recommendation is outside the Court's authority in this matter. The Court is unable to refer a child whose competency is at issue and has not been adjudicated of any offense to a residential treatment facility for anything other than competency attainment services.

{¶ 29} On March 12, 2024, the court held an adjudication hearing on three new cases concerning J.D. at which J.D. admitted to additional offenses. The court did not proceed to disposition on the three new cases. However, the court stated on

the record that "a Residential Treatment Facility or . . . a Community Corrections Facility would be in [J.D.'s] best interest at this time." The court referred "this matter to our Placement Department to look for the best placement to fit for you." The court asked J.D. if he had any questions, and J.D. replied, "No. I'm just going to keep doing good." The court told J.D., "It's going to be like a therapeutic environment that you're going to go to."

{¶ 30} On April 22, 2024, the court held a dispositional hearing on this case and J.D.'s three new cases. The court also attempted to hold an adjudication hearing on yet another case concerning J.D., but the court found that J.D. was not "in the mood to do that," after he answered, "No. I don't understand none of that" when asked if he understood his rights. J.D. requested that the court just send him to ODYS.

{¶ 31} Carly Keller with Placement Planning spoke at J.D.'s dispositional hearing and stated that she "sent out referrals to both Residential Treatment Facilities and Community Correctional Facilities." Keller further testified that there were not "any acceptances." Keller stated that, as an example, J.D. was "declined" at one particular facility "either due to his — unfortunately, his low IQ and cognitive ability to understand their treatment programming." Keller also stated that some facilities "are already at capacity." Keller set forth one other example of a facility at which J.D. had an interview, "however, . . . the person reported that he was not cooperative during that interview."

**{¶ 32}** A CCDCFS representative spoke at J.D.'s dispositional hearing and stated that, "[u]nfortunately, he has not been accepted to any placements that the Agency has reached out to." It was established at this hearing that J.D. had been at the Detention Center for 370 days because it "happened to be the only place that he could be [placed] at."

**{¶ 33}** The court sentenced J.D. to time served for the new cases and, on this aggravated robbery case, committed J.D. to ODYS for a minimum of three years and a maximum "not to exceed [J.D.'s] attainment of the age of [21] years." The court issued a corrected journal entry on May 1, 2024 committing J.D. to ODYS for a minimum of two years and a maximum "not to exceed [J.D.'s] attainment of the age of [21] years."

**{¶ 34}** J.D. appeals and raises the following assignments of error for our review:

I.    J.D. was deprived of his constitutional right to effective assistance of counsel when counsel failed to object to a plea that was not knowingly, intelligently, and voluntarily given and when counsel failed to object when the juvenile court did not comply with the mandatory timing requirements in the competency statutes.

II.    The juvenile court erred when it failed to adhere to the statutory timing requirements for conducting competency evaluations and hearings in violation of R.C. 2152.57, R.C. 2152.58, and R.C. 2152.59.

III.    The juvenile court abused its discretion when it allowed J.D. to proceed to disposition when he was incompetent.

IV.    The juvenile court erred as a matter of law when it found that it did not have the authority to order J.D. to undergo residential competency treatment.

## II.    Competency Hearing Testimony

{¶ 35} The following testimony was presented at the January 24, 2024 second competency hearing.

### a.  Bridget Bartos

{¶ 36} Bridget Bartos ("Bartos") testified that she is an administrative assistant at the Juvenile Court Diagnostic Clinic and, in her role as administrative assistant, she conducts the Competency Remediation Program.  The primary goal of this program "is for the youth involved to gain a better understanding of the court process, to be able to work with their attorney, and to be able to understand the nature and seriousness of their charge."  There are eight "modules" to the program and participation takes a minimum of eight weeks depending on scheduling.  Typically, each session is one hour long and occurs once per week.

{¶ 37} According to Bartos, J.D. has completed the program twice and she was the "primary teacher" the second time he participated in the program.  Bartos testified that J.D. was cooperative and had a good attitude "most of the time."  J.D. successfully completed the program in nine sessions, including "pre-tests," the "lesson" and "post-tests."  Asked if it would surprise her that J.D.'s "reported IQ [is] in the 50 range," Bartos answered, "No."

### b. Dr. Lynn Williams

**{¶ 38}** Dr. Williams testified that she is employed as a forensic psychologist in the Cuyahoga County Juvenile Court Diagnostic Clinic and part of her job is to complete competency assessments. Dr. Williams testified that on December 15, 2023, she completed a competency evaluation regarding J.D. and on December 27, 2023, she authored the Third Competency Report. According to Dr. Williams, this evaluation was a "post-remediation" assessment, because J.D. had completed the remediation program for the second time at the time that she evaluated him. Dr. Williams testified that the remediation program is "a structured educational program that reviews the core [concepts] related to competency sufficient to meet the Ohio Statute for the standards."

**{¶ 39}** As part of the evaluation, Dr. Williams spoke with Bartos. It was Dr. Williams' understanding that, during the remediation program, there were "a few instances where [J.D.] had some behavioral difficulties but overcame them and was able to remain on task."

**{¶ 40}** Dr. Williams testified that competency evaluations typically last "about an hour." In J.D.'s case, however, the interview lasted 20 minutes because "it was clear he wasn't meaningfully engaged." Dr. Williams terminated her interview with J.D. because "he just kept saying I don't know."

**{¶ 41}** Dr. Williams learned from someone at the Detention Center that J.D. "cut off his electronic monitoring bracelet and was gone for the weekend, and then after a court hearing, he had no violations from February 16th to March 3rd."

According to Dr. Williams, J.D. "had some behavioral problems" while he was at the Detention Center. Dr. Williams specified that J.D.'s "poor behavior" included "a lack of motivation, refusal to work on assignments, outbursts, engaging in inappropriate conversations, and using inappropriate language." Dr. Williams testified that she learned from another person at the Detention Center that J.D. was compliant with his mental health medications.

{¶ 42} According to Dr. Williams, J.D. received "special education" at school dating back to 2016, when "he qualified in the category of emotional disturbance . . . related to his [ADHD] diagnosis and [DMDD] diagnosis." Dr. Willams further testified that J.D. has also been diagnosed with ODD and Primary Insomnia and he reads at a first-grade level. According to Dr. Williams, someone with these same diagnoses, including someone with an IQ in the "56, 58 . . . range," can be found competent. To put J.D.'s IQ into context, Dr. Williams explained that "generally 70 to 56 would [be] mild" intellectual disability and "55 or under is considered moderate. . . ."

{¶ 43} As to her interview with J.D., Dr. Williams testified that he was "minimally cooperative," he wanted to refuse the evaluation and his participation was "very poor." Dr. Williams testified that J.D.'s evaluation was "partially done," rather than "fully done" because of J.D.'s minimal participation. Dr. Williams testified that she relied on "collaterals" to form her opinion of J.D. because "there wasn't much interviews."

{¶ 44} Dr. Williams testified that, in her opinion, J.D.'s "diagnoses and mental health conditions" do not prevent him from assisting in his own defense, nor do they prevent him from understanding the nature and objectives of his legal proceeding. According to Dr. Williams, J.D. "is able to focus, if he chooses to."

{¶ 45} On cross-examination, Dr. Williams testified that although she reviewed the Second Competency Report, she did not talk to Dr. Stinson and she did not include any of the findings from his report in her report. Dr. Williams further agreed that "someone with [J.D.'s first-grade] reading level would require someone [else] actually reading to him . . ." and that J.D. would not be able to "read the documents that are before him" as part of this case.

{¶ 46} Dr. Williams testified about a previous competency evaluation of J.D. that was conducted when J.D. was 12 years old. This report concluded that J.D. was "not competent and . . . not remediable."

### c. Dr. Amy Justice

{¶ 47} Dr. Amy Justice ("Dr. Justice") testified that she runs the Remediation Program and Bartos is the facilitator. Asked about the outcome of J.D.'s participation in this program, Dr. Justice replied, "You know, I didn't review the paperwork for this particular youth." Dr. Justice was handed J.D.'s Remediation Termination report and, after reviewing it, she agreed that J.D. successfully completed the program.

{¶ 48} According to Dr. Justice, a "good majority of the children who we have in the program do have lower IQs," intellectual disabilities and mental health

concerns.    Dr. Justice testified that Bartos structured the program to accommodate someone who has a general education and someone who has a learning disability. Although the material is still the same, Bartos "makes it where it's interactive.  She has games.  She has puzzles.  She has slides.  She has things to look at.  She has things that are just oral or verbal.  So it really does touch at children who are visual learners, those who are kinesthetic learners, and those who are verbal learners."

### d. Dr. Bob Stinson

{¶ 49} Dr. Bob Stinson ("Dr. Stinson") testified that he evaluated J.D. for competency to stand trial on June 28, 2023, and issued the Second Competency Report on August 2, 2023.   Dr. Stinson interviewed J.D. and read the First Competency Report, the Competency Remediation Termination Summary and records from the "Positive Education Program" from March 2020 through February 2023.   Dr. Stinson also "followed up" with J.D.'s case manager and this person's supervisor at CCDCFS as well as J.D.'s guardian ad litem.  Dr. Stinson testified as follows about his interview with J.D.:

> So as I outlined in my report, he was difficult to interview.  He — you know, I would describe him as irritable.  You know, we said in the report that we never really felt like we established a full rapport with him.  He refused to answer certain questions.
>
> More things I think were frustrating for him, so if it — there were things about Children's Services, for example, or why he was living with his aunt instead of his mom, why he was expelled from school.  Things that frustrated him, he would just refuse to answer.
>
> So — which may have been kind of a mal-adaptive attempt to cope, which is kind of what we call avoidance coping.  If I just avoid it, then

that's how I'm going to deal with it. But in any event, there were certain things that he just wouldn't talk to us about.

There were things that he was quick to say I don't know about, even though I suspected maybe he did know. But he was frustrated, easily frustrated, had poor frustration tolerance.

We did get some information from him. We put that in our report.

Ultimately, though, he walked out of the interview before we wanted it to be over. We had — We really questioned him about most of the things we wanted to question him about, but as is typical with the evaluations I do, we'll perhaps do some teaching along the way or some coaching along the way, and then at the end of the evaluation, say, look, we want to go back over some things that we talked about earlier, to kind of assess whether he comprehended that information, retained the information, can share it back.

And that's when he said, I'm not — I'm not answering questions a second time, I'm done, and walked out.

{¶ 50} Dr. Stinson testified that J.D. "has a long history of mental health problems," including the following:

He's been in special education for emotional disturbance since kindergarten, since he was five years old, diagnosed with ADHD since he was at least ten years old, been on medications, psychotropic medications, since he was ten years old.

Had a suicide attempt when he was eleven years old. Had been psychiatrically hospitalized at MetroHealth for aggression and behavior problems. As I said, he was on an IEP since kindergarten. He went in the PEP Program at age nine.

And then he's had several diagnoses. He's been diagnosed with [ADHD]. He's been diagnosed with [DMDD]. He's been diagnosed with an Other Trauma Disorder. And he's obviously had a number of behavior problems.

In addition to those kind of primary mental health problems, he also has limited cognitive abilities, so he's been diagnosed at times with Borderline Intellectual Functioning . . . ."

{¶ 51} Asked about J.D.'s IQ, Dr. Stinson testified as follows:

[J.D.] had his IQ tested three different times and has had remarkably consistent scores, full scale IQ of 59, 57, and 58. Those are — Those are very low scores, below, you know, the .01 percentile, meaning below — if you lined up a thousand people, he'd be at the lowest end.

So he's got very, very low scores.

There's some indication that those scores might be an under estimate of his true abilities, because during testing, he had poor frustration tolerance, he was quick to give up sometimes.

But it's also worth noting, those scores are consistent with his adaptive functioning, they're consistent with his academic achievement scores, and so that lends some credibility to those scores.

Maybe they under estimate his true abilities, but they appear to reflect his actual functioning, his actual performance.

{¶ 52} Dr. Stinson testified that "there was no evidence [J.D.] was feigning . . . . I got the impression that [J.D.], quite contrary to feigning deficits, tries to mask his deficits. He gets frustrated quickly if he doesn't understand what's going on, and then he just tries to detach, not talk, avoid, rather than show or highlight his deficits."

{¶ 53} Dr. Stinson testified that J.D. "has a fairly significant trauma history," starting with his father being murdered when J.D. was two months old. J.D. "lost a sibling" when J.D. "was about four or five years old." J.D.'s maternal grandfather was incarcerated and, when the grandfather got out of prison, he began spending time with J.D. CCDCFS has been involved with J.D.'s family since before J.D. was born. Dr. Stinson testified that the CCDCFS "case worker said really every year there

was pretty much something being reported. Typically, neglect, because of the living arrangements he was in, physical abuse, or witnessing severe domestic violence."

{¶ 54} According to Dr. Stinson, J.D. "denied engaging in behaviors that would be consistent with the development of a conduct disorder. . . . But the records clearly indicate, and others would suggest, that he is engaged in significant behavioral problems." Dr. Stinson listed these "problems" as follows: "refusing to go to school, defiance, noncompliance at home, having frequent outbursts, taking off when he wasn't allowed to, getting in fights, being violent, being combative, hanging out with negative peers, being verbally and physically aggressive. Perhaps getting involved in gangs when he was associated with negative peers."

{¶ 55} Dr. Stinson testified that J.D.'s diagnosis of DMDD is consistent with J.D.'s "long history of irritability and anger outbursts that are disproportionate to any provocation." Dr. Stinson explained that DMDD is more than "someone who's just . . . an angry kid . . . ." Rather, DMDD categorizes "a person who for years has not been able to get his anger under control and has, you know, repeated outbursts weekly over little things, and his outbursts are completely out of proportion to those things."

{¶ 56} According to Dr. Stinson, J.D.'s history at school was "much like" his history at home. J.D. was "having disruptive behaviors, he's acting out, he can't control his impulses, can't control his emotions, has difficulty comprehending, is having difficulty getting along with others." Dr. Stinson further testified that, because of J.D.'s low I.Q. and "low adaptive functioning," J.D. is "essentially unable

to read and write." Dr. Stinson noted that, although J.D. is being treated with medications for ADHD, he is "not getting medications" and he is "not getting any kind of counseling or therapy" for his DMDD or "his Trauma Disorder." Dr. Stinson explained further:

> So those conditions are untreated and it's — I mean, the ADHD is problematic. It contributes to impulsivity. But really it's the [DMDD] and the Trauma Disorder that I think are causing his major impairments in terms of functional impairment for competency.

> Being able to tolerate stress, being able to tolerate frustration, being able to engage appropriately with others, being able to hear things you don't want to hear.

> Until those are treated, I don't anticipate that there's going to be much change in his functioning.

{¶ 57} Dr. Stinson testified that DMDD has "a pretty high bar to get diagnosed with. You have to have repeated disproportionate anger outbursts, on average three or more times a week for a year or longer." Dr. Stinson testified that, although he sees no "fault with" recommending that J.D. complete the Remediation Program, "that's not addressing the problems that I think are interfering with his competency." Dr. Stinson continued:

> But the real issue is this emotional dysregulation. It's the second prong of competency. It's the ability to assist, the ability to stay present in the courtroom, track proceedings, not get upset if you're paying attention, not checking out because you don't want to get upset, being able to consult with your attorney, talk about your charges, talk about the evidence against you. That's the issue.

{¶ 58} Dr. Stinson stressed that a youth "can successfully complete [a competency remediation program] and not be competent to stand trial."

Conversely, a youth "can unsuccessfully go through [a competency remediation program] and be competent to stand trial." In other words, Dr. Stinson explained that there is more to competency than a remediation program.

{¶ 59} Dr. Stinson testified about the Third Competency Report, which found that J.D. was competent, as follows:

> I don't think [Dr. Williams'] findings were drastically different than what I and Dr. Ezzo saw. I think she just reached a different opinion than what I and Dr. Ezzo did.
>
> You know, I think she was only able to spend 20 minutes with [J.D.]. And a point I would make, and I made this to my [colleague] when we left after [J.D.] walked out on us is, we're trained psychologists trying to use all of our skills to manage his emotions and keep him in the room while we're having a conversation about these things.
>
> And I couldn't do it, I couldn't do it with the help of [my colleague], Dr. Williams couldn't do it. . . .
>
> So I've got to believe if she couldn't get him to stay in the room, that it's going to be hard for a lawyer to get him to manage those same emotions.

{¶ 60} Dr. Stinson took exception to one thing that Dr. Williams said in the Third Competency Report — "something to the effect of, you know, he can do things if he chooses to." According to Dr. Stinson, "If it was that easy to educate someone with an IQ of 58, then we would have just told his teachers a long time ago, Hey, just simply explain things to him and he'll get it. That's not really how it works. Particularly in an emotionally charged environment like a courtroom where he's getting frustrated and things like that." Dr. Stinson concluded, "If that was the case, [J.D.] wouldn't be reading at a first grade level right now."

{¶ 61} Dr. Stinson opined that "the only reason [Dr. Williams] can get to the second prong [of the competency test] and say that [J.D.] can assist in his defense is because she says, well, if he chooses to." According to Dr. Stinson, "what's getting in the way of [J.D.] choosing to" is "since age five, emotional reactivity, it's poor frustration tolerance, it's, you know, anger outbursts that are disproportionate to any provocation." Dr. Stinson testified that Dr. Williams' opinion "oversimplifies and is dismissive of, you know, ten, fifteen years of, even at his young age, of documentation that he's got mental health problems that interfere with him actually doing that."

{¶ 62} Dr. Stinson concluded that J.D. "likely at least has the basic understanding of the nature and the objective of the proceedings." However, Dr. Stinson was "much more concerned about [J.D.'s] ability to assist in his defense." Dr. Stinson opined that J.D. "requires residential placement . . . until he gets [his mental-health issues] managed. . . . I would recommend a residential treatment plan . . . to address his emotional disorder. I think once that's addressed, the competency stuff will fall in place."

{¶ 63} Dr. Stinson concluded that, without this treatment, J.D. fails the second prong of the competency test. Dr. Stinson agreed that competency is "fluid," meaning that at a certain point in time, "an individual like [J.D.] may be competent, may be functioning, able to assist in his defense, and other times, not . . . ."

{¶ 64} Asked about J.D. being manipulative throughout the Remediation Program, Dr. Stinson replied as follows: "I don't doubt that he can be manipulative.

I just don't think that at age five and eight and nine and ten and eleven, when we saw all these problems starting, that he was thinking ahead that I'm going to lay the bed-work for feigning problems in court ten years from now."

{¶ 65} Dr. Stinson testified that J.D.'s "combination of disorders . . . all need to be addressed." Dr. Stinson recommended a residential treatment program as the "best course" for J.D. Ultimately, Dr. Stinson concluded that J.D. was incapable of assisting in his own defense due to "behavioral" issues and not "being able to control his emotions." Dr. Stinson further testified that it was "fair to say" that J.D. "has fallen through the cracks with getting his trauma and behavioral disabilities or disorders treated."

{¶ 66} The court asked Dr. Stinson if his "residential facility recommendation" was made "to address competency attainment . . . or to address the underlying . . . diagnoses." Dr. Stinson replied, "I think to address the underlying problem" and explained that, for example, if this case was dismissed, J.D. would still need the treatment. Dr. Stinson further testified that "once that's treated, then I think competency will be much clearer."

### III. Law and Analysis

#### a. Overview of Competency Evaluations in Juvenile Court

{¶ 67} "As the United States Supreme Court has long held, due process protections must be afforded to children." *State v. D.T.*, 2024-Ohio-4482, ¶ 64 (8th Dist.). *See also In re Gault*, 387 U.S. 1, 30-31 (1967); *State v. Aalim*, 2017-Ohio-2956, ¶ 23. "Fundamental to our adversarial system of justice is the due process

right of a criminal defendant who is legally incompetent not to be subjected to trial." *State v. Were*, 94 Ohio St. 3d 173, 174 (2002). Ohio courts have consistently held that "the right not to be tried or convicted while incompetent is as fundamental in juvenile proceedings as it is in criminal trials of adults." *In re Bailey*, 2002-Ohio-6792, ¶ 10 (2d Dist.).

{¶ 68} The Ohio Supreme Court has held that a "defendant is rebuttably presumed to be competent to stand trial." *State v. Lawson*, 2021-Ohio-3566, ¶ 48. A "competency determination is necessary only when a court has reason to doubt the defendant's competence." *Godinez v. Moran*, 509 U.S. 389, 401, fn. 13 (1993).

{¶ 69} Juvenile competency determinations are governed by R.C. 2152.51 through R.C. 2152.59. Competency concerns "a child's ability to understand the nature and objectives of a proceeding against the child and to assist in the child's defense." R.C. 2152.51(A)(1). "A child is incompetent if, due to mental illness, . . . developmental disability, or . . . lack of mental capacity, the child is presently incapable of understanding the nature and objective of proceedings against the child or of assisting in the child's defense." *Id.*

{¶ 70} Pursuant to R.C. 2152.52(A)(1), "[i]n any proceeding under this chapter . . . any party or the court may move for a determination regarding the child's competency to participate in the proceeding." Within 15 "business days" after a competency motion is made, "the court shall do one of the following:"

> Make a determination of incompetency under division (B) of section 2152.52 of the Revised Code;

Determine, without holding a hearing, whether there is a reasonable basis to conduct a competency evaluation;

Hold a hearing to determine whether there is a reasonable basis to conduct a competency evaluation.

R.C. 2152.53(A). "If the court holds a hearing, it shall make its determination within ten business days after the conclusion of the hearing." R.C. 2152.53(B).

{¶ 71} If the court orders a competency evaluation, the evaluator "shall submit to the court a written competency assessment report," which "shall include the evaluator's opinion as to whether the child, due to mental illness, . . . developmental disability, or . . . lack of mental capacity, is currently incapable of understanding the nature and objective of the proceedings against the child or of assisting in the child's defense." R.C. 2152.56(A). Additional requirements for a competency evaluation report are found in R.C. 2152.56(C) and (D):

(C) . . . If the evaluator concludes that the child's competency is impaired but that the child may be enabled to understand the nature and objectives of the proceeding against the child and to assist in the child's defense with reasonable accommodations, the report shall include recommendations for those reasonable accommodations that the court might make. If the evaluator concludes that the child's competency is so impaired that the child would not be able to understand the nature and objectives of the proceeding against the child or to assist in the child's defense, the report shall include an opinion as to the likelihood that the child could attain competency within the periods set forth in division (D)(2) of section 2152.59 of the Revised Code.

(D) If the evaluator concludes that the child could likely attain competency within the periods set forth in division (D) (2) of section 2152.59 of the Revised Code, the competency assessment report shall include both of the following:

(1) A recommendation as to the least restrictive setting for child competency attainment services that is consistent with the child's ability to attain competency and the safety of both the child and the community;

(2) A list of the providers of child competency attainment services known to the evaluator that are located most closely to the child's current residence.

{¶ 72} Pursuant to R.C. 2152.57(A), competency evaluation reports shall be submitted to the court "not more than [45] days after the order appointing the evaluator is issued." The court is required to hold a competency hearing not more than 30 "business days after receiving an evaluation . . . ." Additionally, "the court shall make a written determination as to the child's competency or incompetency based on a preponderance of the evidence within [15] business days after completion of the hearing." R.C. 2152.58(D)(1).

{¶ 73} Pursuant to R.C. 2152.59(C), if the court determines, after a competency hearing, that the child "is not competent but could likely attain competency by participating in services specifically designed to help the child develop competency, the court may order the child to participate in services specifically designed to help the child develop competency . . . ." R.C. 2152.59(D) governs "competency attainment services" and states, in part, that the services "shall be provided in the least restrictive setting that is consistent with the child's ability to attain competency and the safety of both the child and the community." R.C. 2152.59(D)(1). As to the "maximum periods of participation" in these services, R.C. 2152.59(D)(2)(b) provides, in part, that if the child "is ordered to receive

competency attainment services that are provided in a residential setting that is operated solely or in part for the purpose of providing competency attainment service, the child shall not participate in those services for a period exceeding . . . six months if the child is charged with an act that would be a" first-degree felony "if committed by an adult . . . ."

### b. Ineffective Assistance of Counsel

{¶ 74} In J.D.'s first assignment of error, he argues that his counsel was ineffective in two respects: first, when counsel failed to object to J.D.'s admission to aggravated robbery, which was taken while J.D. was incompetent and second, when counsel failed to object to the court not complying with various timing requirements in the juvenile competency statutes. The overall gist of J.D.'s first argument under this assignment of error is that his counsel was ineffective for failing to raise the issue of competency prior to J.D.'s admission and failing to file a motion to withdraw J.D.'s admission. Specifically, J.D. argues in his appellate brief regarding his first argument under this assignment of error as follows:

> The issue of J.D.'s competency was not raised until after he was adjudicated delinquent. And, it was not raised by his attorneys; rather, it was raised by a committee of court employees who met with J.D. to determine what his disposition should be. Once the issue was raised, J.D. was found incompetent. Instead of protecting his statutory and constitutional rights, his attorneys did nothing. Thus, his attorneys were ineffective and J.D.'s adjudication must be reversed.

{¶ 75} To succeed on a claim of ineffective assistance of counsel, a juvenile must establish that his or her attorney's performance was deficient and that the juvenile was prejudiced by the deficient performance. *Strickland v. Washington*,

466 U.S. 668 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [juvenile] as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St.3d 136 (1989). "The Sixth Amendment to the United States Constitution guarantees an accused juvenile the same rights to effective assistance of counsel as an adult criminal defendant." *In re M.B.*, 2018-Ohio-4334, ¶ 54 (8th Dist.).

### i. Failing to Raise the Issue of Competency Prior to J.D.'s Admission and Failing to File a Motion to Withdraw J.D.'s Admission

{¶ 76} In this case, J.D. entered an admission to aggravated robbery with a firearm specification and a forfeiture specification, on September 13, 2022. During the plea hearing, the following colloquy took place:

| | |
|---|---|
| THE COURT: | Okay. And so you're making a knowing decision? You understand what you're doing, correct? |
| J.D.: | Yes, your Honor. |
| THE COURT: | Intelligent decision; is that correct? Are you making an intelligent decision? |
| J.D.: | No, your Honor. |
| THE COURT: | A smart — intelligent — A smart decision? |
| J.D.: | No, your Honor. |
| THE COURT: | You're not making a smart decision? Let me — Are you making an intelligent decision? |
| J.D.: | What did you say? |
| THE COURT: | Are you making an intelligent decision? |

| | |
|---|---|
| J.D.: | Yes, your Honor. |
| THE COURT: | Okay. And it's voluntary. No one is making you make this decision; is that correct? |
| J.D.: | No, your — Yes, your Honor. |

{¶ 77} The juvenile court accepted J.D.'s admission to aggravated robbery and ordered the ODYS Committee to review J.D.'s case and make a recommendation regarding disposition. The Referral Form regarding this case which is dated October 6, 2022 — three weeks after J.D. entered his admission — details J.D.'s "Probation History," including the dismissal of three cases in 2018 and 2019 because J.D. was found not competent to stand trial. The Referral Form recommends that J.D. be placed in a residential treatment facility. "[J.D.] would benefit from a residential placement. [J.D.] needs to address peer relationships, mental health concerns, education and family interaction. [J.D.] was placed on Probation and although he was terminated from placement the court was under the impression that [J.D.] was being placed by CCDCFS in a residential facility."

{¶ 78} The Referral Form resulted in the court ordering that J.D. undergo a competency evaluation which was conducted by Dr. Ezzo on October 26, 2022. Dr. Ezzo issued the First Competency Report on October 31, 2022, and recommended that J.D. needed "reasonable accommodations during court proceedings," or, if the "accommodations do not result in an understanding and appreciation of the core statutory requirements [for] competency to stand trial," then J.D. needed a "referral to the Diagnostic Clinic's Competency Remediation Program . . . ."

{¶ 79} On December 7, 2022, the juvenile court referred J.D. to the Remediation Program. However, this referral did not result in J.D. participating in the Remediation Program. The court held a competency hearing on March 3, 2023, and found that J.D. was not competent to stand trial but that he had "the opportunity to become competent by participating in the court Remediation Services."

{¶ 80} J.D. completed the Remediation Program on May 1, 2023. On May 5, 2023, the court issued a journal entry ordering J.D. to undergo a second competency evaluation at the request of J.D.'s counsel and J.D.'s guardian ad litem. On July 10, 2023, the court issued a journal entry finding that the competency evaluation "has yet to be completed." In this journal entry, the court also relieved J.D.'s counsel of any further representation of J.D. and appointed new counsel.

{¶ 81} On August 2, 2023, Dr. Stinson found J.D. incompetent to stand trial. On November 3, 2023, the court ordered J.D. to undergo a third competency evaluation. On December 27, 2023, Dr. Williams found J.D. competent to stand trial. The court held another competency hearing on January 24, 2024, and on February 27, 2024, issued a journal entry finding J.D. "competent to participate in this proceeding." The court concluded that Dr. Stinson's recommendation "was for residential treatment to stabilize [J.D.'s] behavior and mental health" but found that, "[p]ursuant to R.C. 2152.59, this recommendation is outside the Court's authority . . . ." The court proceeded to disposition on April 22, 2024, and committed J.D. to ODYS.

{¶ 82} At the time that J.D. admitted to aggravated robbery, which was on September 13, 2022, his counsel had reason to believe that J.D.'s competency was at issue. A cursory look at J.D.'s history with the juvenile justice system shows that he had been found incompetent in three previous cases. On October 6, 2022, approximately three weeks after J.D.'s admission in this case, the juvenile court's Diagnostic Clinic raised the issue of J.D.'s competency. J.D. was found incompetent on March 3, 2023, and he was found competent on January 24, 2024.

{¶ 83} At no time during the pendency of this case did either of J.D.'s counsel move to have J.D.'s admission vacated because of the realistic possibility that J.D. was incompetent when he entered it. We hold that both of J.D.'s counsel were deficient in this failure. *See State v. Berry,* 72 Ohio St.3d 354, 359 (1995) ("The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial."). Here, there was more than sufficient indicia of incompetency to require an inquiry into J.D.'s competence.

{¶ 84} The only "competency attainment service" J.D. received during the pendency of this case was the court's Remediation Program. Evidence in the record consistently shows that this program educates youth about court processes and procedures. The remediation program does not include "treatment" for any of J.D.'s mental-health disorders or intellectual disabilities, as would be typical for competency restoration of adults in the criminal justice system. *See, e.g.,* R.C.

2945.38(B)(1)(a)(i) ("If . . . the court finds that the defendant is incompetent to stand trial and that there is a substantial probability that the defendant will become competent to stand trial within one year if the defendant is provided with a course of treatment, the court shall order the defendant to undergo treatment.").

{¶ 85} In the juvenile system different words are used regarding competency than in the adult criminal justice system. Pursuant to R.C. 2152.29(C), if a juvenile court "determines that a child is not competent but could likely attain competency by participating in services specifically designed to help the child develop competency, the court may order the child to participate in services specifically designed to help the child develop competency at county expense."

{¶ 86} J.D.'s counsel's failure to move to withdraw J.D.'s admission based on competency issues prejudiced J.D. because, had J.D.'s admission been vacated, evidence in the record indicates that J.D. would have been found incompetent at the time he entered his admission. Furthermore, his competency would have been addressed in a more timely manner and he would have been given the opportunity to participate in services designed to attain competency prior to entering an admission or proceeding to trial.

{¶ 87} We hold that both of J.D.'s trial counsel were ineffective for failing to raise the issue of J.D.'s competency prior to his admission to aggravated robbery and for failing to move to withdraw J.D.'s admission.[5]

---

[5] We note that J.D.'s appellate counsel is not the same as either of J.D.'s trial counsel.

### ii. Failure to Object to the Court not Complying with Various Timing Requirements in the Juvenile Competency Statutes

**{¶ 88}** The second part of J.D.'s first assignment of error concerns counsel's failure to object to the court's failure to follow the timing requirements of the juvenile competency statutes. "The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel. To prevail on such a claim, a defendant must first show that there was a substantial violation of any defense counsel's duties to his client and, second, that he was materially prejudiced by counsel's ineffectiveness." *State v. Holloway*, 38 Ohio St.3d 239, 244 (1989).

**{¶ 89}** J.D.'s second assignment of error alleges that the court erred by failing to follow the statutory timing requirements outside of the realm of ineffective assistance of counsel. For the same reasons we find plain error in relation to J.D.'s second assignment of error in the next section of this opinion, we find that counsel was ineffective in failing to object to these errors.

**{¶ 90}** Accordingly, J.D.'s first assignment of error is sustained.

### c. Statutory Timing Requirements for Conducting Competency Evaluations of Juveniles

**{¶ 91}** In J.D.'s second assignment of error, he argues that the "juvenile court erred when it failed to adhere to the statutory timing requirements for conducting competency evaluations and hearings . . . ." J.D. further argues that the "juvenile court violated [his] right to due process when it made its competency determination outside of the hearing requirements set forth in R.C. 2152.27 – R.C. 2152.59." We

address the timeliness issue as it relates to the following instances raised by J.D. in his appellate brief.

{¶ 92} The First Competency Report was filed with the court on October 31, 2022.  Pursuant to R.C. 2152.57(A), the court was required to hold a competency hearing not more than 30 "business days after receiving" this evaluation.  The court held a competency hearing 123 days later on March 3, 2023, in violation of R.C. 2152.57(A).

{¶ 93} The court ordered the second competency evaluation on May 5, 2023.  Pursuant to R.C. 2152.57(A), the Second Competency Report should have been filed with the court within 45 days of this order.  Instead, the Second Competency Report was filed with the court 89 days later, on August 2, 2023.  Furthermore, pursuant to R.C. 2152.57(A), the court was required to hold a competency hearing within 30 business days of August 2, 2023.  The court held a competency hearing almost six months later on January 24, 2024, in violation of R.C. 2152.57(A), and, prior to holding this hearing, the court ordered a third competency evaluation of J.D.

{¶ 94} The court ordered the third competency evaluation on November 1, 2023.  Pursuant to R.C. 2152.57(A), the Third Competency Report should have been filed with the court within 45 days of this order.  The Third Competency Report was filed with the court 56 days later, on December 27, 2023, in violation of R.C. 2152.57(A).

{¶ 95} It is undisputed that neither of J.D.'s counsel objected to any of these examples of untimeliness.  Therefore, we review this argument for plain error.

"Under the plain-error standard, we will not reverse unless there was an error that was so plain that it created an 'obvious defect in the . . . proceedings,' and the error" affected the outcome of the proceedings. *In re R.H.*, 2013-Ohio-1030, ¶ 8 (8th Dist.) quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 96} A careful reading of the State's appellate brief shows that it does not argue against the court's failure to adhere to various statutory timeframes. In other words, the State appears to concede that the juvenile court erred. The State, therefore, only argues that J.D. did not show that he was prejudiced by this failure.

{¶ 97} In *In re S.D.*, 2014-Ohio-2528 (8th Dist.), this court reviewed a similar issue to the one presented here under the following assignment of error: "S.D. was denied his right to due process of law when the juvenile court determined him competent to stand trial outside the parameters of R.C. 2152.57(A), 2152.58(A) and (D), the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 16 of the Ohio Constitution." *Id*. at ¶ 11.

{¶ 98} The *S.D.* Court established that, "[u]nder R.C. 2152.59, once a minor is found incompetent but able to be restored to competency within a reasonable time, a plan for restoration services is to be initiated and the child monitored according to the further provisions within that statute." *Id*. at ¶ 27. In *S.D.*, the court detailed that S.D.'s competency evaluation was submitted 50 "calendar days after the evaluation was ordered in violation of R.C. 2152.57(A)," which requires the report to be submitted 45 calendar days after it was ordered. Additionally, the trial court in S.D. held the competency hearing "on the same day [the evaluation] was

submitted to the court in violation of R.C. 2152.28(A)," which requires the court to hold the hearing "[n]ot less than [15] nor more than [30] business days after receiving an evaluation . . . ." Furthermore, the trial court in *S.D.* determined his competence 20 "business days after the hearing was conducted in violation of R.C. 2152.58(D)," which requires the trial court to "make a written determination as to the child's competency or incompetency . . . within [15] days after completion of the hearing."

{¶ 99} The *S.D.* Court further explained that, in S.D.'s case, "the trial court ordered that [S.D.] receive medications and supervision at the detention facility where he was being housed awaiting adjudication." *Id.* The *S.D.* Court found that S.D. was restored to competency, and that, although "the evaluations indicated [S.D.] had significant mental health issues, . . . he was alert, aware of what was going on around him, and able to assist counsel and participate in the proceedings." *Id.* at ¶ 30. The court concluded that "there is no indication that the failure of the trial court to strictly abide by the temporal requirements set forth in the statute caused any prejudice to" S.D. *Id.* The court further concluded that there were no "instances of conduct that would indicate that [S.D.'s] mental state had changed." *Id.* at ¶ 31.

{¶ 100} Upon review, we find this case to be different than *In re S.D.* The record in this case is replete with examples of how J.D. "fell through the cracks" in the system. While the juvenile court in *S.D.* missed the timing requirements by mere days, the juvenile court in J.D.'s case missed multiple timing requirements by months and in some instances did not adhere to the statutory requirements at all.

{¶ 101} The most striking example of prejudice to J.D. was the court's failure to adhere to R.C. 2152.58(A), which requires the court to hold a competency hearing "[n]ot less than [15] nor more than [30] business days after receiving an evaluation . . ." in relation to the Second Competency Report authored by Dr. Stinson. The court sua sponte ordered a third competency evaluation of J.D. and held a hearing on the Second Competency Report and the Third Competency report together on January 24, 2024, almost six months after receiving the Second Competency Report. Had the court conducted the hearing according to the statute, the Second Competency Report, along with the First Competency Report, would have been the only reports admitted into evidence because they were the only reports that existed at that time. Both reports indicated that J.D. was incompetent to stand trial at that time.

{¶ 102} We acknowledge that additional competency evaluations are contemplated by R.C. 2152.57(E), which states as follows: "Before a [competency] hearing is held . . ., any party may object to the contents of a competency assessment report and by motion request an additional evaluation," which shall be completed within 45 days. There is simply no evidence in the record that any actions were taken to trigger R.C. 2152.57(E), and there is no evidence in the record that this statute was followed.

{¶ 103} Upon review, we find that J.D. was prejudiced by the court's failure to adhere to the timing requirements in the juvenile competency statutes.

Accordingly, the court plainly erred, and J.D.'s second assignment of error is sustained.

### d. Failure to Order Residential Competency Treatment

{¶ 104} In J.D.'s fourth assignment of error, he argues that the "juvenile court erred as a matter of law when it found that it did not have the authority to order J.D. to undergo residential competency treatment."

{¶ 105} In the Second Competency Report, Dr. Stinson concluded by stating, in part, as follows: "[I]t is important to note that [J.D.] does not need residential services solely for the purposes of competency attainment and once his behavior and mental health is stabilized he could attain competency on an outpatient basis." In the court's February 27, 2024 journal entry finding J.D. competent, the court concluded that Dr. Stinson's recommendation "was for residential treatment to stabilize [J.D.'s] behavior and mental health but that he does not require that restrictive of a setting for the purposes of competency attainment services and those could be completed in the community following residential treatment." The court further concluded that it had no "authority" to follow this recommendation: "The Court is unable to refer a child whose competency is at issue and has not been adjudicated of any offense to a residential treatment facility for anything other than competency attainment services."

{¶ 106} First, we note that J.D. was adjudicated delinquent of aggravated robbery in this case and we are unsure why the court relied on its apparent inability

"to refer a child whose competency is at issue and has not been adjudicated of any offense . . . ." This scenario does not apply to J.D.

{¶ 107} Second, we are guided by R.C. 2152.59, which governs, in part, "competency attainment services." Without analyzing the minutiae of this statute, we note that R.C. 2152.59(D)(2)(b) states, in part, as follows: "If a child is ordered to receive competency attainment services that are provided in a residential setting that is operated solely or in part for the purpose of providing competency attainment services . . . ." In other words, this statute envisions as part of the juvenile justice system residential facilities that are "operated solely or in part for the purpose of providing competency attainment services. . . ."

{¶ 108} Dr. Stinson testified at the January 24, 2024 competency hearing about his ultimate recommendation for J.D., which was also submitted to the court via the Second Competency Report. Dr. Stinson opined that J.D. "requires residential placement . . . until he gets [his mental-health issues] managed . . . . I would recommend a residential treatment plan . . . to address his emotional disorder. I think once that's addressed, the competency stuff will fall into place." Our review of this recommendation — both what Dr. Stinson concluded in the Second Competency Report and to what he testified at the competency hearing — shows that Dr. Stinson thought the best course of action was to get J.D. the help he needed in a residential facility designed, at least in part, to allow J.D. to attain competency. In J.D.'s case, it appears that he needs more than the court's remediation program to attain competency. In Dr. Stinson's opinion, J.D.'s

underlying mental-health issues need to be treated if J.D. is to attain competency to stand trial as contemplated under R.C. 2152.51 through 2152.59.

{¶ 109} Accordingly, the court erred by finding that it had no "authority" to follow Dr. Stinson's recommendation, and J.D.'s fourth assignment of error is sustained.

{¶ 110} J.D.'s third assignment of error is rendered moot pursuant to App.R. 12(A)(1)(c).

{¶ 111} Judgment reversed. Case remanded to the juvenile court to allow J.D. to file a motion to withdraw his admission.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

EILEEN T. GALLAGHER, J., and
KATHLEEN ANN KEOUGH, J., CONCUR