[Cite as *In re O.J.*, 2026-Ohio-354.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE O.J.                                  :

A Minor Child                               :          No. 115272

                                            :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 5, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-25101451

---

### *Appearances:*

Gregory T. Stralka, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and David Meredith, Assistant Prosecuting Attorney, *for appellee.*

---

DEENA R. CALABRESE, J.:

{¶ 1} Appellant O.J. ("appellant") appeals the order of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), adjudicating him delinquent and committing him to the Ohio Department of Youth Services ("ODYS"). Appellant contends the juvenile court erred by accepting his admission to the allegations against him without further exploring his competency. For the reasons that follow, we affirm the juvenile court's judgment.

## I. Facts and Procedural History

### A. The Complaint

{¶ 2} In early 2025, appellant was 17 years old and had already been committed to ODYS in connection with other proceedings. On February 2, 2025, while awaiting transport to a different facility, appellant allegedly attacked a detention officer in his housing unit, beating the officer to the point of unconsciousness. On February 13, 2025, the Cuyahoga County Prosecutor's Office charged appellant with one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree if committed by an adult. On February 18, 2025, the State, pursuant to R.C. 2152.10(B) and Juv.R. 30, sought discretionary bindover to the general division, seeking to have appellant tried as an adult.

### B. Arraignment Hearing

{¶ 3} Arraignment took place on March 12, 2025, with the trial court opening proceedings by noting that it was responsible for appellant's current ODYS commitment and "had [appellant] in front of [it] on a couple of different occasions." (Mar. 12, 2025 tr. 4.) Appellant, through counsel, entered a denial to the complaint and objected to the State's bindover motion. The juvenile court addressed appellant directly, explaining both his constitutional rights and the process involved in discretionary bindovers, including a probable-cause hearing and an amenability hearing. When asked (twice) if he understood his rights and the process, appellant

twice responded in the affirmative. At no point during the arraignment did any party, including appellant's attorney, raise issues concerning competency.

### C. Probable-Cause Hearing

{¶ 4} On April 24, 2025, the juvenile court held a probable-cause hearing. Appellant appeared with counsel, as well as his guardian ad litem ("GAL"). Counsel informed the juvenile court that appellant was prepared to stipulate to probable cause. The juvenile court again directly addressed appellant to inform him of his rights, including the rights he would be waiving by stipulating to probable cause. When asked if he understood, appellant replied, "Yes, Your Honor." (Apr. 24, 2025 tr. 9.) The juvenile court next explained what would occur prior to and at an amenability hearing, including a psychological evaluation that the juvenile court would use to "guide [it] at the time of our amenability hearing" and a summary of the hearing process. (Apr. 24, 2025 tr. 9-11.) Asked if he understood, appellant again replied, "Yes, Your Honor." (Apr. 24, 2025 tr. 11.)

{¶ 5} The juvenile court next inquired whether appellant had "had enough time to speak to [his] attorneys here today about [his] decision to agree that there's probable cause[.]" (Apr. 24, 2025 tr. 11.) Appellant responded in the affirmative. He likewise confirmed that he was not under the influence of drugs, alcohol, or medication that would prevent him from understanding that day's proceedings and that he had not been threatened or promised anything in exchange for stipulating to probable cause. The juvenile court stated on the record that it found that appellant

was "entering into a knowing, intelligent, and voluntary stipulation." (Apr. 24, 2025 tr. 12.)

{¶ 6} In a corresponding journal entry, the juvenile court ordered that the matter be "continued for a full investigation into the child's social history, education, family situation, and any other factor on whether the child is amenable to juvenile rehabilitation." It further ordered "the Cuyahoga County Juvenile Court Clinic to conduct a psychological evaluation of the child." At no point during the probable-cause hearing did any party, including appellant's attorney or GAL, raise any issues surrounding appellant's competency.

### D. The Amenability Hearing

{¶ 7} The juvenile court held an amenability hearing on May 20, 2025, to determine whether appellant was amenable to care and rehabilitation through the juvenile court system or should be bound over to the general division. At the outset, the juvenile court explained the hearing process, including the State's burden of proof and appellant's right to refrain from testifying. Appellant indicated he understood.

{¶ 8} The State first called the detention officer to provide the court, as the prosecution put it, with "a factual basis of what happened." (May 20, 2025 tr. 11.) The detention officer described the attack, which he characterized as unprovoked, and indicated he lost consciousness and "woke up . . . seeing [his] manager's face." (May 20, 2025 tr. 15.) The prosecution also walked the detention officer through surveillance video of the incident and had him testify to his injuries, including

surgical repair of his jaw. The detention officer indicated that at the time of his testimony, he was still "not a hundred percent" recovered. (May 20, 2025 tr. 25.)

{¶ 9} The State's next witness was appellant's juvenile probation officer, who served as a "placement after care coordinator." (May 20, 2025 tr. 31.) He testified regarding his duties in that role:

> So my specific duties are when kids get ordered to be placed at residential facilities, I will go out to visit them once a month in person, and then in the meantime, just oversee their progress through treatment, schedule team meetings, basically just — just monitor their progress in residential treatment.
>
> And then once they complete that program, they come back to the community, and they are placed on community supervision with me.

(May 20, 2025 tr. 31-32.) Appellant had been assigned to the probation officer during residential treatment at Summit Academy in Pennsylvania. The probation officer testified that appellant completed the program in June 2023, and had done "fairly well." He elaborated:

> The final report that I received from Summit Academy, if I remember correctly, he made the honor roll, so he did very well in school. He kept himself very active in a lot of what the program had to offer.
>
> And overall, by the time that the six-month mark had been reached, his behaviors were mostly positive, and he definitely made some good progress in the program.

(May 20, 2025 tr. 34.)

{¶ 10} The situation deteriorated, however, once appellant returned home. Appellant stopped communicating, leading to a capias in August 2023. Cleveland police later arrested appellant on an unrelated matter, and appellant "returned to the attention of the court on October 31st of 2024." (May 20, 2025 tr. 36.) Those

proceedings ultimately concluded in a disposition committing appellant to ODYS on January 21, 2025.  The same trial court judge who presided over this matter also presided over that case.[1]

{¶ 11} The State next called Dr. Douglas Waltman, a Ph.D. psychologist and licensed chemical dependency counselor who has worked with the juvenile court system for approximately 30 years.  Dr. Waltman testified that in that capacity he had performed "a variety of evaluations for delinquent youth," including "[a]menability exams *like the one we have here now*, and also . . . competency to stand trial." (Emphasis added.) (May 20, 2025 tr. 48.)[2]  Testimony then turned to his process in conducting amenability examinations.

{¶ 12} Dr. Waltman identified State's exhibit No. 3 as the report he prepared pursuant to Juv.R. 30.  His core testimony focused on appellant's amenability to treatment and rehabilitation within the juvenile justice system.  Much of Dr. Waltman's testimony, therefore, is not pertinent to this appeal.  Moreover, neither the word "competency" nor any variant appears at any other point during Dr. Waltman's testimony, including cross-examination, and it is undisputed that no party suggested appellant might not be competent to stand trial or moved for a competency evaluation and hearing.  We therefore focus only on those portions of

---

[1] We note this only to clarify, for purposes of whether appellant ever displayed indicia of incompetency, that the juvenile court judge's direct interactions with appellant extended beyond the present matter.

[2] Dr. Waltman's reference to competency examinations can be read as distinguishing that type of examination from the amenability examination he conducted in this case.

Dr. Waltman's testimony that might, at least according to appellant's theory on appeal, have relevance to appellant's competency.

{¶ 13} In that regard, Dr. Waltman testified, consistent with his report, that appellant fell into the lower range of normal or average intelligence for his age group. He specifically testified that appellant was "in the average range." (May 20, 2025 tr. 52.) Reading from his own report, he further testified that "[f]rom strictly an intellectual standpoint, [appellant] has the intelligence to identify risky situations, rationally assess the consequences of his actions, and exercise good judgment in his decision-making." (May 20, 2025 tr. 53.)[3] He further testified that "[a]ny observed impairment in these abilities are due to factors other than to basic intelligence[,]" for example "impulsivity" and "poor socialization." (May 20, 2025 tr. 53.) He further testified that appellant expresses "an intellectual kind of remorse" (in the sense of saying he felt bad about what happened) rather than displaying an "affective expression of remorse." (May 20, 2025 tr. 67-68.) Appellant, he testified, "has the capacity to express empathy." (May 20, 2025 tr. 67.) Providing another example, Dr. Waltman testified that while appellant might struggle with identifying alternative actions when presented with the opportunity to engage in criminal conduct, "he has the cognitive capacity to realize, [w]ell, . . . it's a wrong thing to do[.]" (May 20, 2025 tr. 74.)[4]

---

[3] The report further states that appellant "has the intelligence to identify high-risk situations and determine probable outcome."

[4] On cross-examination, Dr. Waltman testified that he asked how the victim in an unrelated case might feel, "[a]nd [appellant] said, 'Traumatized.'" (May 20, 2025 tr. 90.)

{¶ 14} Dr. Waltman testified that consistent with his observations of appellant and his experience, he would expect such an individual to have academic problems. He testified that appellant did have academic difficulties, particularly related to math. (We note, in reviewing the report, that Dr. Waltman observed that appellant performed significantly better with respect to verbal skills.) On cross-examination, consistent with his report, Dr. Waltman testified that appellant's mental-health diagnoses included post-traumatic stress disorder ("PTSD"). (May 20, 2025 tr. 86.) He agreed with a PTSD diagnosis and found that appellant frequently used marijuana as a coping mechanism. (May 20, 2025 tr. 94-95.) He further agreed that appellant had a learning disability. Dr. Waltman testified to having "some concern" regarding psychopathy, but indicated that while appellant could "behave in a callous manner," he also had "some remorse and regrets for what he's done" and scored low with respect to psychopathic features. (May 20, 2025 tr. 91.)

{¶ 15} The juvenile court followed up with additional questions, which appeared to be driven not only by testimony but by a review of Dr. Waltman's report. The court asked, for instance, whether "ADHD, PTSD, or conduct disorder" were all considered mental illnesses. (May 20, 2025 tr. 103.) Dr. Waltman responded in the affirmative. He also clarified the distinction he drew between intellectual remorse and affective remorse.

---

Asked if this was a typical response for a youthful offender, Dr. Waltman stated, "Not really." (May 20, 2025 tr. 90.)

{¶ 16} The State rested pending admission of its three exhibits (video of the incident, the victim's medical records, and Dr. Waltman's report). All three exhibits were admitted without objection. The State formally rested, and the defense rested as well, indicating it did not intend to call witnesses.

{¶ 17} The juvenile court heard closing arguments. In making its case for bindover, the State conceded the R.C. 2152.12(E)(7) factor, i.e., that appellant did have a mental illness or intellectual disability based on Dr. Waltman's testimony regarding "post traumatic stress disorder, ADHD, cannabis use, and conduct disorder." (May 20, 2025 tr. 119.) The defense argued against bindover but focused its arguments principally on rehabilitative potential and the harm that could await minors in the adult prison system. Again, no variant of the word "competency" was mentioned.

{¶ 18} The juvenile court went through the statutory factors meticulously, indicating, inter alia, that while appellant was physically mature enough for transfer, his level of emotional and psychological maturity factored against transfer pursuant to R.C. 2152.12(E)(6). The juvenile court also found that appellant suffered from a mental illness or intellectual disability, additional factors weighing against transfer pursuant to R.C. 2152.12(E)(7). The court found that there was "sufficient time to rehabilitate [appellant] within the Juvenile System and that the level of the security available in the Juvenile System provides a reasonable assurance of public safety." (May 20, 2025 tr. 136.) The juvenile court also noted that appellant appeared to display remorse while the prosecution played video of the attack. It stated that

"while he is someone who normally is attentive and looking at the person that is speaking to him, his head was down the entire time." (May 20, 2025 tr. 137.) The juvenile court denied the State's request to transfer the case to the general division.

### E. Adjudication and Disposition

{¶ 19} Appellant appeared before the juvenile court on June 9, 2025, for purposes of adjudication and disposition. Lead counsel for appellant indicated on the record that he, his cocounsel, and appellant's GAL had discussed with appellant the possibility of admitting to the sole count in the State's complaint, stating that they "have all had occasion to discuss that possibility with him, and it's my understanding, having been advised of his Constitutional Rights and the possible consequences, that he will enter that change in plea this morning." (June 9, 2025 tr. 5.) Once again, neither the parties nor the juvenile court voiced any concerns regarding appellant's competency.

{¶ 20} The juvenile court then conducted an extensive colloquy with appellant. It once again explained his constitutional rights, including the right to go to trial and hold the State to its burden of proof beyond a reasonable doubt, the right to cross-examine the State's witnesses, the right to call his own witnesses, and his right to remain silent if he chose not to testify. Asked if he understood his rights and that he would be giving them up by entering an admission, appellant twice responded, "Yes, Your Honor." (June 9, 2025 tr. 7.) The colloquy continued with the juvenile court's recitation of possible sanctions. At every turn, appellant indicated he understood the juvenile court's statements. The juvenile court asked

appellant if he had any questions and whether his admission was the result of threats or promises. To each question, appellant replied "No, Your Honor." (June 9, 2025 tr. 9.) The juvenile court then stated:

> Let the record reflect the Court [is] satisfied that [appellant] has been informed of his Constitutional Rights. He understands the nature of the charges, the effect of an admission, and the penalties or consequences which may be imposed.
>
> I further find that he's about to enter into a knowing, intelligent, and voluntary admission here today.

(June 9, 2025 tr. 9-10.)

{¶ 21} The juvenile court then asked appellant: "[W]ith respect to the sole count in the complaint, Count 1, felonious assault, a felony of the second degree, do you admit or deny[?]" (June 9, 2025 tr. 10.) Appellant responded, "I admit." (June 9, 2025 tr. 10.) The trial court accepted the admission and adjudicated appellant delinquent.

{¶ 22} The juvenile court then proceeded to disposition. The State argued for a term of ODYS commitment consecutive to appellant's current term of two years. Appellant understandably sought leniency, with counsel arguing that his behavior had improved.

{¶ 23} In allocution, when asked by the juvenile court why he assaulted the detention officer, appellant immediately requested clarification regarding the court's expectations: "You want me to speak?" (June 9, 2025 tr. 14.) The juvenile court indicated it did. Appellant then responded in detail:

> Well, like for the past time, like for me being in the house pod, I had problems with that staff. Like he didn't say, but I had problems with

him. Like, we really didn't have no like weird connection with each other. But like he was like a picky staff towards me, like as far as like he used to check my room, throw my letters away. Like but at the same time, I know he was doing his job, like he had to do certain things. But it was like he was just always picky, pick like picky, like picking at me towards him. And I got fed up with it, and that's — led to my actions, that I'm sorry about doing.

(June 9, 2025 tr. 14-15.) The juvenile court asked appellant how he now felt about the incident. He responded: "I'm disappointed. I know I'm wrong, and I feel bad for what I did to him." (June 9, 2025 tr. 15.)

{¶ 24} The juvenile court asked appellant if he understood that it had been lenient with him in the past, and also that if he had been bound over to the general division he faced the potential of a significant prison term. Appellant indicated he understood. The juvenile court also further emphasized its past interactions with appellant:

[O]bviously, we have gotten to know each other a little bit over the past how many years since you've been coming in front of me. I, obviously, have learned a lot about you, and I know a lot about you from all of those prior cases and all of the reports that's been provided to the Court.

(June 9, 2025 tr. 17-18.) Appellant thanked the court for its leniency in the past:

Well, honestly, like I thank you for giving me chances. Like you give me — you gave me chances to do better and step myself up, but I'm still working on it to this day[.]

(June 9, 2025 tr. 18.) The court explained to appellant that he would "still have that option, because [it] found [him] amenable," which would allow appellant to "continue to work on [himself]" and "to continue to learn and to grow and to mature," and that he "wouldn't have those same opportunities had [he] been bound

over and gone to prison." (June 9, 2025 tr. 18.) Appellant replied, "I understand, your Honor." (June 9, 2025 tr. 18.) The juvenile court then noted appellant's improved performance at school, urging him to continue his studies "so that you can graduate." (June 9, 2025 tr. 19.)

{¶ 25} The juvenile court committed appellant to ODYS custody for a minimum term of one year, consecutive to his two-year commitment in Cuyahoga J.C. No. DL23108243. It explained: "[T]hat means once you're done with serving that two-year commitment, you will then start serving the one year on this." (June 9, 2025 tr. 20.) Appellant indicated he understood.

{¶ 26} This timely appeal followed.

## II. Assignment of Error

{¶ 27} Appellant presents a single assignment of error for our review:

> The trial court erred when it accepted the Appellant's admission without first determining the extent of his mental health disorder and the effect it had on his ability to understand the consequences of his plea.

{¶ 28} Finding no merit to the appeal, we affirm.

## III. Analysis

{¶ 29} Appellant does not employ the word "competency" in framing his assignment of error. He tips his hand, however, in his App.R. 16(A)(4) statement of the issue presented for review:

> The issue presented on appeal involves whether the trial court should have accepted Appellant's admission when considerable evidence and testimony was presented regarding the Appellant's mental health issues and whether he was *competent* to enter a change of plea.

(Emphasis added.)

{¶ 30} "'As the United States Supreme Court has long held, due process protections must be afforded to children.'" *In re J.D.*, 2025-Ohio-746, ¶ 67 (8th Dist.), quoting *State v. D.T.*, 2024-Ohio-4482, ¶ 64 (8th Dist.). This includes the fundamental "'due process right of a criminal defendant who is legally incompetent not to be subjected to trial.'" *In re J.D.* at ¶ 67, quoting *State v. Were*, 94 Ohio St.3d 173, 174 (2002). Ohio courts, therefore have consistently held that "'the right not to be tried or convicted while incompetent is as fundamental in juvenile proceedings as it is in criminal trials of adults.'" *In re J.D.* at ¶ 67, quoting *In re Bailey*, 2002-Ohio-6792, ¶ 10 (2d Dist.). *See also In re K.A.*, 2017-Ohio-6979, ¶ 10 (8th Dist.).

{¶ 31} In juvenile proceedings, as in adult proceedings, "[t]he competency standard for pleading guilty is the same as competency to stand trial." *Id.* at ¶ 11. "A defendant who is not competent to stand trial is not competent to enter a negotiated plea." *State v. Cruz*, 2010-Ohio-3717, ¶ 17 (8th Dist.); *In re K.A.* at ¶ 11. When the issue of competency is raised prior to a plea, the plea itself does not waive a challenge regarding failure to conduct a competency hearing. "[A] challenge based on a lower court's failure to hold a competency hearing or make a competency determination 'goes directly' to whether a defendant's plea was voluntary, knowing, and intelligent." *D.T.* at ¶ 75, quoting *In re K.A.* at ¶ 19, fn. 2.

{¶ 32} In the context of juvenile proceedings, this court very recently explained:

The Ohio Supreme Court has held that a "defendant is rebuttably presumed to be competent to stand trial." *State v. Lawson*, 165 Ohio St.3d 445, 2021-Ohio-3566, ¶ 48, 179 N.E.3d 1216. *A "competency determination is necessary only when a court has reason to doubt the defendant's competence." Godinez v. Moran*, 509 U.S. 389, 401, fn. 13, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

Juvenile competency determinations are governed by R.C. 2152.51 through R.C. 2152.59. Competency concerns "*a child's ability to understand the nature and objectives of a proceeding against the child and to assist in the child's defense.*" R.C. 2152.51(A)(1). "A child is incompetent if, due to mental illness, . . . developmental disability, or . . . lack of mental capacity, *the child is presently incapable of understanding the nature and objective of proceedings against the child or of assisting in the child's defense.*" *Id.*

(Emphasis added.) *In re J.D.* at ¶ 68-69.

{¶ 33} R.C. 2152.52(A)(1) provides that "[i]n any proceeding under this chapter . . . any party or the court may move for a determination regarding the child's competency to participate in the proceeding." Such a motion then triggers certain statutory obligations on the part of the trial court regarding inquiries into a child's competency, including specific timing parameters and a requirement that the trial court declare the child incompetent, determine that there is a reasonable basis to order a competency evaluation, or hold a hearing to determine if there is a reasonable basis for a competency evaluation. *See In re J.D.*, 2025-Ohio-746, at ¶ 70 (8th Dist.), citing R.C. 2152.52(A) and 2152.53(B). *See also D.T.*, 2024-Ohio-4482, at ¶ 84 (8th Dist.).

{¶ 34} In the present case, appellant's trial counsel never raised the issue of competency before the trial court and therefore never triggered any statutory requirements. Where the issue was never raised below, we review appellant's

competency argument for plain error. *In re J.D.* at ¶ 95. "Under the plain-error standard, we will not reverse unless there was an error that was so plain that it created an 'obvious defect in the . . . proceedings,' and the error" affected the outcome of the proceedings. *In re R.H.*, 2013-Ohio-1030, ¶ 8 (8th Dist.), quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). *See also In re J.D.* at ¶ 95; *State v. Ford*, 2004-Ohio-5610, ¶ 22-23 (8th Dist.). In this context, "[t]he right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *State v. Berry*, 72 Ohio St.3d 354, 359 (1995), quoting *Drope v. Missouri*, 420 U.S. 162, 175 (1975). *See also Ford* at ¶ 34; *State v. Moore*, 2020-Ohio-3459, ¶ 34 (8th Dist.); *State v. Finley*, 2024-Ohio-1058, ¶ 35 (8th Dist.); *State v. Elliott*, 2015-Ohio-3766, ¶ 21 (8th Dist.).

{¶ 35} *In re K.A.*, 2017-Ohio-6979 (8th Dist.), like the present case, involved an admission by a juvenile. In that case, the issue of competency had been raised, the juvenile court ordered a competency evaluation, and the evaluator deemed K.A. competent. The defense, however, did not stipulate to a finding of competency, and the juvenile court failed to follow its statutory obligations regarding a competency hearing and written determination. The State argued that this was harmless error because the record did not "reveal sufficient indicia of incompetency." *In re K.A.* at ¶ 13. This court rejected the State's argument that the record was devoid of sufficient indicia of incompetence. While the most recent competency evaluation (never

stipulated to) deemed K.A. competent, it also noted that K.A. had been found incompetent in earlier cases, that K.A. "functions in the borderline to extremely low range of intellectual capabilities," and that he did not appear to understand "the concepts of confidentiality, nonconfidentiality, the role of the prosecutor, the process by which decisions are made, and his right not to be compelled to testify against himself." *Id.* at ¶ 17.

{¶ 36} The present case is distinguishable from *In re K.A.*, and not merely because in that action, unlike this one, the issue of competency had been raised. In the present action, nothing in the record suggests appellant had ever been found incompetent during any previous involvement with the juvenile justice system. The psychologist evaluating appellant found that he was of average (albeit low-average) intelligence rather than the "borderline to extremely low range of intellectual capabilities" evidenced by K.A. *Id.* at ¶ 17. Furthermore, appellant appeared to grasp the court process at every turn, including his right not to be compelled to testify against himself. After confirming multiple times, on multiple occasions, that he understood that right, he arguably displayed that understanding after the juvenile court accepted his admission and turned to allocution prior to disposition. The juvenile court asked him why he assaulted the detention officer, and he immediately sought clarification, asking the juvenile court: "You want me to speak?" (June 9, 2025 tr. 15.) This suggests that he had understood his right to remain silent and that he was able to ask for clarification of the juvenile court's expectations at this phase of the proceedings.

{¶ 37} Moreover, while appellant's statements in allocution consisted principally of excuses, his remarks were articulate and rational. Unlike the facts of *In re K.A.*, this does not suggest the inability to understand the court process or to aid in his own defense.

{¶ 38} Appellant's answers to the court's inquiries during the admission colloquy, and in earlier proceedings, likewise reflect his understanding of the court process. For example, he repeatedly answered "yes" when asked whether he understood his rights and consistently answered "no" when asked if he had been threatened or promised anything in exchange for his admission or was under the influence of drugs or alcohol. His responses betrayed no evidence of confusion.

{¶ 39} In that regard, and in other respects, this case is distinguishable from *In re J.D.*, 2025-Ohio-746 (8th Dist.), which also involved a juvenile's admission.[5] In that case, this court highlighted the following exchange between the juvenile court and J.D. during the hearing in which he admitted to the offense:

> THE COURT: Okay. And so you're making a knowing decision? You understand what you're doing, correct?
>
> J.D.: Yes, your Honor.
>
> THE COURT: Intelligent decision; is that correct? Are you making an intelligent decision?
>
> J.D.: No, your Honor.
>
> THE COURT: A smart — intelligent — A smart decision?

---

[5] *In re J.D.* involved a claim of ineffective assistance of counsel in failing to raise the issue of competency prior to his admission and failing to move to withdraw the admission. This court's substantive focus, however, was on indicia of incompetence.

J.D.: No, your Honor.

THE COURT: You're not making a smart decision?  Let me — Are you making an intelligent decision?

J.D.: What did you say?

THE COURT: Are you making an intelligent decision?

J.D.: Yes, your Honor.

THE COURT: Okay.  And it's voluntary.  No one is making you make this decision; is that correct?

J.D.: No, your — Yes, your Honor.

*Id.* at ¶ 76.

{¶ 40} J.D.'s confusion during this exchange is immediately evident.  This court further wrote that "[a] cursory look at J.D.'s history with the juvenile justice system show[ed] that he had been found incompetent in three previous cases" and was even found incompetent again after his admission in the case under review.  *In re J.D.* at ¶ 82.  On the record before it, this court found that "there was more than sufficient indicia of incompetency to require an inquiry into J.D.'s competence" and that there was therefore a "realistic possibility that J.D. was incompetent when he entered" his admission.  *Id.* at ¶ 83.

{¶ 41} We have already noted that the record contains nothing to indicate appellant was ever found to be incompetent or that the issue of competence had ever been raised during his time in the juvenile justice system.  Unlike *In re J.D.*, the transcripts do not suggest appellant was confused by the juvenile court process, that he was otherwise unable to understand the nature and objective of the proceedings,

or that he could not assist in his own defense. As noted above, the only point at which he arguably displayed confusion was during allocution when the trial court asked him to speak openly about the assault. Earlier that day and in previous proceedings, the trial court had appropriately informed appellant that he had the right to remain silent. Appellant's momentary confusion during allocution was understandable, and his question to the juvenile court appeared to be a logical and thoughtful request for clarification. If anything, this reflects appellant's grasp of the process as a whole and his ability to aid in his own defense.

{¶ 42} The various diagnoses highlighted by the testifying psychologist do not alter the outcome. In *State v. Pubill*, 2023-Ohio-3875 (8th Dist.), a case involving "outrageous courtroom behavior" by the defendant, this court noted that "'[i]ncompetency must not be equated with mere mental or emotional instability or even outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel.'" *Id.* at ¶ 22, quoting *State v. Bock*, 28 Ohio St.3d 108, 110 (1986). A trial court "'may not find a defendant incompetent to stand trial or plead guilty solely because he suffers from a mental illness or intellectual disability.'" *Pubill* at ¶ 22, quoting *State v. McMillan*, 2017-Ohio-8872, ¶ 29 (8th Dist.). "'[A] defendant's emotional or mental instability does not establish incompetence for the purpose of negating a plea, which was otherwise voluntarily, knowingly, and intelligently made.'" *State v. Hawkins*, 2019-Ohio-4162, ¶ 17 (8th Dist.), quoting *State v.*

*Prettyman*, 2002-Ohio-1096 (8th Dist.). *See also Finley*, 2024-Ohio-1058, at ¶ 37 (8th Dist.).

{¶ 43} In *Finley*, the defendant suffered from schizophrenia and had a history of substance abuse. This court nevertheless observed:

> But Finley answered the trial court's questions during the colloquy appropriately and without any signs of confusion or misunderstanding. Nothing in the record demonstrates that he was struggling to understand what was occurring at the plea hearing so as to put the trial court on notice that a competency evaluation was warranted. The record does not reflect anything out of the ordinary in Finley's behavior and demeanor in the courtroom, and his counsel at no point suggested that he was unable to assist in his defense.

*Id*. at ¶ 38. In the present case, appellant likewise answered the juvenile court's questions appropriately, with no signs of misunderstanding or confusion, and his attorneys never suggested he might be incompetent. Furthermore, nothing in the transcripts suggested that appellant struggled to understand the proceedings or otherwise behaved in a manner suggesting incompetence. *See Elliott*, 2015-Ohio-3766, at ¶ 23 (8th Dist.) (trial court did not err in not sua sponte conducting competency hearing; while defendant was schizophrenic and had not been taking his medication, "the record [did] not reflect anything out of the ordinary in Elliott's behavior and demeanor in the courtroom," and his attorney did not suggest he was incompetent); *State v. McCoy*, 2009-Ohio-4284 (5th Dist.) (diagnosis of mild developmental disability did not warrant a sua sponte competency hearing where nothing in the record suggested defendant did not understand the nature and objective of the proceedings or that he was unable to assist in his own defense).

**{¶ 44}** In *Moore*, 2020-Ohio-3459 (8th Dist.), the defendant argued that a mitigation-of-penalty report prepared for purposes of sentencing "revealed 'mental health issues' that should have been reviewed by a mental health professional to determine his competency and that [he] 'was also possibly denied necessary medications which could have assisted him in aiding in his own defense and making proper legal decisions.'" *Id.* at ¶ 39. The report detailed Moore's placement in special education and learning disability classes while in middle school and high school, as well as his extensive history of substance abuse. *Id.* at ¶ 40. This echoes appellant's claim in this appeal, where he appears to contend that Dr. Waltman's report somehow triggered the juvenile court's obligation to inquire further into his competency.

**{¶ 45}** This court rejected Moore's arguments. Consistent with the case law above, this court wrote that "simply because Moore may have suffered from a mental disorder or a learning disability and may have benefited from medication to treat his condition, does not mean he was not competent to enter a guilty plea." *Id.* at ¶ 40. It further held that "[a] trial court may not find a defendant incompetent to stand trial or plead guilty solely because he suffers from a mental illness or a learning or intellectual disability[,]" and that "[a] defendant suffering from an emotional or mental disability or a learning disability may still possess the ability to understand the charges and proceedings against him or her and be able to assist in his or her defense." *Id.* at ¶ 41. This court further explained:

> The test for competency focuses entirely on the defendant's ability to understand the meaning of the proceedings against him and his ability to assist in his own defense, which can be satisfied regardless of the defendant's mental status or IQ.

*Id.* at ¶ 41.

{¶ 46} This court then found that the record contained no indicia of incompetence where there was "nothing to suggest that any mental condition or learning disability Moore may have had (or the consequences of any prior drug use or abuse) precluded him from understanding the nature and objective of the proceedings against him, in assisting in his defense or in otherwise entering knowing, intelligent and voluntary guilty pleas." *Id.* at ¶ 42. This court found "nothing in the transcript that suggest[ed] Moore was experiencing any cognitive difficulties that impacted his understanding of the nature and objective of the proceedings against him or that inhibited his ability to assist in his defense at the time he entered his guilty pleas" and nothing to indicate he was under the influence of drugs, alcohol, or medication "that would adversely affect his ability to enter into a plea[.]" *Id.* at ¶ 44. Moore interacted with the trial court over the course of several months. The trial court therefore had ample opportunity to observe him and to interact with him. *Id.* at ¶ 43. During that time, Moore "exhibited [his] understanding of the legal process, the charges against him and the consequences of his guilty pleas." *Id.* at ¶ 43. This court cited its earlier opinion in *State v. Almashni*, 2010-Ohio-898 (8th Dist.), in which it held that even if the trial court erred by failing to hold a competency hearing after a competency evaluation had

been ordered, the error was harmless where the record did not contain sufficient indicia of incompetence. *Id*. at ¶ 11-14.

{¶ 47} *Moore* is remarkably similar to this case. The record reflects that the juvenile court had the opportunity to observe and interact with appellant extensively over the course of several hearings. We find nothing in the transcripts or anywhere else in the record suggesting any indicia of incompetence, much less indicia sufficient to require the juvenile court to order a competency evaluation sua sponte. The juvenile court trial judge was familiar with appellant from previous proceedings, and this case alone involved four separate in-person appearances on four separate dates. At no point during those hearings did appellant's behavior, including his exchanges with the court, suggest he was experiencing cognitive difficulties affecting his understanding of the nature of the proceedings or his ability to assist in his defense. Furthermore, at the beginning of the adjudication hearing, appellant's lead counsel indicated that appellant had consulted with two attorneys and his GAL before deciding to admit to the complaint. These same professionals raised no competency concerns.

{¶ 48} The psychologist who evaluated appellant in connection with possible bindover, and who filed a 14-page report, noted appellant's mental-health diagnoses but never raised any competency concerns either in the report or during his extensive testimony. Dr. Waltman wrote in his report that while appellant was "diagnosed with an unspecified learning disability," he "does not have an Intellectual Developmental Disorder." Dr. Waltman described appellant as having "adequate

reading skills" and "the intellectual ability to recognize high-risk situations and address potential outcomes." Indeed, Dr. Waltman wrote that appellant "has the intelligence to identify risky situations, rationally assess the consequences of his actions, and exercise good judgment in his decision-making." Dr. Waltman further reported that appellant told him he had "been employed three times" and wanted "to finish his education to improve his life." Appellant's "thinking was logical and reality oriented," and he "displayed adequate insight." "Mental health records," Dr. Waltman wrote, "[did] not indicate a history for psychoticism."

{¶ 49} We have independently reviewed the record. Appellant's counsel never requested a competency evaluation, and the record is devoid of any indicia of incompetence that would require sua sponte inquiry into appellant's competency. Nothing suggests that appellant's decision to admit to the sole count in the complaint was anything other than voluntarily, knowingly, and intelligently made. Appellant's assignment of error is overruled, and the juvenile court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The finding of delinquency having been affirmed, any bail or stay of execution pending appeal is terminated. Case remanded to the juvenile court for execution of commitment.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

LISA B. FORBES, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR